UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KALA CHENIER,** | * CIVIL ACTION NO. |
| **Plaintiff,** | * |
| | * |
| vs. | * JUDGE |
| | * |
| **SOUTHEASTERN LOUISIANA UNIVERSITY; SEDGWICK CLAIMS MANAGEMENT SERVICES; UNIVERSITY OF LOUISIANA SYSTEM MANAGEMENT BOARD, in their official capacities;** | * |
| | * |
| | * MAGISTRATE |
| | * |
| **Defendants.** | |
| * * * * * * * * * * * * * * * * * * | * JURY TRIAL DEMANDED |

## COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff Kala Chenier, a person the full age of majority domiciled in the Eastern District of Florida, who alleges as follows:

### I. JURISDICTION AND VENUE

1. This action alleges the violation of rights under 20 U.S.C. § 1681 ("Title IX"). Thus, the predominant action herein gives rise to the jurisdiction in this Court pursuant to 28 U.S.C. § 1331. Furthermore, there exists additional state causes of action that arise out of the same transaction or occurrence as the underlying federal cause of action, and this Court has ancillary jurisdiction over these counts pursuant to 28 U.S.C. § 1367.

2. The events or omissions giving rise to the instant lawsuit all occurred within the Eastern District of Louisiana. Venue lies in this Court over these claims pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

1

3.     Southeastern Louisiana University ("Southeastern") received federal financial assistance and is therefore subject to the dictates of Title IX.

## II.    PARTIES

4.     Chenier is a former student of Southeastern.

5.     Made Defendant herein is Sedgwick Claims Management Services, which, upon information and belief, is the insurer providing coverage to Defendants for acts or omissions of officers, directors, and administrators.

6.     Made Defendant herein is the University of Louisiana System Management Board, which, upon information and belief, is the governing body for Southeastern and answerable for the acts or omissions of officers, directors, administrators, and other personnel.

## III.   BACKGROUND FACTS RELEVANT TO ALL COUNTS

7.     The Office of Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation, and enforcement of Title IX.

8.     The OCR has promulgated numerous documents outlining the requirements of an education institution to be in compliance with Title IX, including the Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students or Third Parties ("RSHG") in 2001, which specifically concerns teacher-on-student sexual harassment and sexual assault.

9.     The DOE was authorized by Congress, pursuant to 20 U.S.C. § 1682, to promulgate regulations to govern the implementation, interpretation, and enforcement of Title IX.

10. The RSHG is a "significant guidance document" intended to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance with the DOE. Pursuant to 72 Fed. Reg. 3432, a "guidance document" is "an agency statement of general applicability and future effect, other than a regulatory action . . . that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue." A "significant guidance document" is "a guidance document disseminated to regulated entities or the general public that may be reasonably anticipated to . . . [r]aise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866, as further amended."

11. The RSHG specifically outlines the requirements that educational institutions must follow regarding teacher-on-student sexual harassment and assault.

12. A failure to adhere to the requirements outlined in the RSHG could result in the loss of federal funding for an educational institution.

13. The RSHG states "Sexual harassment of a student by a teacher or other school employee can be discrimination in violation of Title IX. Schools are responsible for taking prompt and effective action to stop the harassment and prevent its recurrence."

14. The RSHG says that "[i]f an employee who is acting . . . in the context of [providing aids, benefits, or services] over students engages in sexual harassment[,] generally this means harassment is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching . . , and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex, [the school] is responsible for the discriminatory conduct."

15. Further, the RSHG provides that a school is "also responsible for remedying any effects of the harassment on the victim, as well as for ending the harassment and preventing its recurrence. This is true whether or not [the school] has 'notice' of the harassment."

16. Even if harassment of a student is not "in the context of the employee's provision of aid, benefits, or services, but nevertheless is sufficiently serious to create a hostile educational environment," the RSHG states that "the school has a duty, upon notice of the harassment, to take prompt and effective action to stop the harassment and prevent its recurrence."

17. Finally, according to the RSHG, a school's failure to take the necessary steps or its failure to act renders the school responsible for stopping the conduct, preventing it from happening again, and remedying the effects of the harassment that could reasonably have been prevented if the school had responded promptly and effectively.

### IV. BACKGROUND FACTS RELATED TO PLAINTIFF KALA CHENIER

18. Chenier was a student at Southeastern from August 2014 until May 2015.

19. Starting in or around January 2015, Chenier was enrolled in a course taught by Dr. Richard Miller ("Miller").

20. In or around January 2015, Miller approached Chenier to give her his private email address. Miller requested Chenier send him a playlist of songs to that private email address as a birthday present. After Chenier sent the song list to Miller, he would frequently remark on the songs he liked the best during course lectures in front of the classroom.

21. On another occasion, Miller walked up to Chenier during one of his lectures and asked her to smell his shirt because he was wearing his wife's perfume. Miller then asked Chenier to smell the crotch of his pants because he had also sprayed perfume in that area.

22. In or around March 2015, Chenier emailed Miller to ask a question about an assignment. In response, Miller set a meeting with Chenier at the coffee shop where she worked and requested Chenier text him when she arrived. Miller then provided Chenier his personal cell phone number. Chenier texted Miller, and Miller replied that he would be keeping her phone number in his phone. Miller also told Chenier that she was to let him know if he ever offended her or made her feel uncomfortable.

23. Miller also sent a picture of himself to Chenier in an email with the subject line of "how I looked for many many years."

24. At the coffee shop meeting in or around March 2015 to discuss the assignment, Miller—without prompting—divulged information about his marriage, including that his wife has chronic pain issues, he had considered leaving his wife, and that he was proud of himself for sticking around. This conversation made Chenier deeply uncomfortable.

25. During a class field trip to Tickfaw State Park, Miller asked Chenier to walk back to the van used for the trip to get the group's lunchboxes. Chenier agreed but tried to signal to her classmates that she was uncomfortable before leaving with Miller. At the van, Miller unlocked the door and held it upon while requesting that Chenier climb past him to collect the lunchboxes. This would have involved bending over in front of him and Chenier declined. Miller looked at Chenier with disappointment after she said no. Upon returning to the area where the rest of the class was gathered, other students commented on Miller's favoritism of Chenier.

26. Miller began visiting Chenier at work unannounced, and on one occasion, Miller brought a bottle of his wife's perfume for Chenier to smell. These visits persisted even after classes had concluded for the semester.

27. There were a number of occasions during the lectures and labs that Miller would walk up to Chenier and brush against her. Miller would sweep his hand across Chenier's backside, lean across her with his arm touching her breast, and stand so closely behind Chenier that she could feel his beard on her neck.

28. In or around May 2015, Chenier attended a review session in advance of the final exam for Miller's class. Miller maintained prolonged eye contact with Chenier during the session. After the review session concluded at approximately 8:45 P.M., Miller approached Chenier about assisting him with watering plants. Two other students were present: one had to go home, and the other was told not to join Chenier and Miller in the greenhouse. All of the lights were off when Chenier and Miller entered the greenhouse, and while waiting for the lights to come on, Chenier observed that Miller was touching himself inappropriately.

29. After this incident, Chenier reported Miller's behavior and met with Dr. Christopher Beachy and Dr. Penny Shockett to discuss her concerns.

30. Chenier had been an "A" student in Miller's class until her classmates pointed out to Miller that he was displaying favoritism. Chenier's grades on assignments and exams then dropped sharply, and she finished with a "B" in the class.

31. Since the incident with Miller, Chenier has transferred schools and moved out of state to better deal with her trauma. Chenier has been seeing a therapist and is now paying out-of-state tuition.

32. Southeastern, through its professors and administrators, had received previous complaints about Miller's behavior from other students and faculty members but failed to take appropriate action on these complaints.

33. If Southeastern had acted in accordance with Title IX guidelines and its own policies and procedures, Chenier would not have been subjected to a hostile environment, including the harassment and assault by Miller.

34. Miller is no longer employed by Southeastern.

V. **COUNT ONE: DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF 20 U.S.C. § 1681 (TITLE IX)**

35. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

36. The University of Louisiana System Management Board's acts and failures to act perpetuated against Plaintiff amounted to unlawful sexual harassment and discrimination on the basis of gender. The harassment and discrimination was sufficiently severe and pervasive to create an abusive, and hostile educational environment for Plaintiff. One or more Southeastern administrators or officials, with authority to take corrective action on Plaintiff's behalf, had actual notice of said harassment and discrimination and failed to adequately respond, in violation of their own policies. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur. As a result, Plaintiff was subject to continuing harassment and a loss of educational opportunity.

37. Additionally, and/or in the alternative, the University of Louisiana System Management Board failed to enact and/or disseminate and/or implement proper or adequate procedures to discover, prohibit or remedy the kind of discrimination that Plaintiff suffered. This failure included, without limitation, non-existent or inadequate customs, policies, or procedures for the recognition, reporting, investigation, and correction of unlawful discrimination, and the failure to properly vet professors such as Miller. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or

was likely to occur. As a result, Plaintiff was subject to continuing harassment and a loss of educational opportunity.

38. The University of Louisiana System Management Board acted with deliberate indifference in deviating significantly from the standard of care outlined by the DOE in the RSHG and Southeastern's own policies.

39. As a result of the University of Louisiana System Management Board's deliberate indifference, Plaintiff suffered loss of educational opportunities and/or benefits and has and will continue to incur attorney fees and costs of litigation.

## VI. COUNT TWO: NEGLIGENCE

40. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

41. At all times relevant, Defendants had a duty to take reasonable measures to protect Plaintiff as a student at Defendants' institution, because they knew that Miller had harassed colleagues and other students. Thus, Defendants were aware of the need to control Miller, and had the ability to control Miller. Defendants also had a duty to take reasonable protective measures to protect Plaintiff and other similarly situated students from the risk of sexual abuse and/or sexual assault, such as the duty to properly warn, train or educate Plaintiff and other students about how to avoid such a risk. This created a special relationship between Defendants and Plaintiff who was entrusted to Defendants' care. Defendants voluntarily accepted the entrusted care of Plaintiff. As such, Defendants owed Plaintiff a duty of care.

42. Defendants, by and through their agents, servants, and employees, knew or reasonably should have known of Miller's dangerous and exploitative propensities, as a result of prior reports of sexual misconduct by Miller, and the prevalence of sexual misconduct and retaliatory conduct against reports of sexual misconduct at Southeastern and other universities

and/or institutions of higher learning. With this knowledge, it was foreseeable that if Defendants did not adequately exercise or provide the duty of care owed to students, including but not limited to Plaintiff, female students would be vulnerable to sexual assault and retaliatory conduct by Miller and others.

43. Defendants, by and through their agents, servants and employees, were acting within the course and scope of their employment at all times relevant and breached their duty of care to Plaintiff by deviating significantly from the standard of care outlined by the DOE in the RSHG.

44. Defendant Crain breached his duty of care by engaging in conduct including, but not limited to:

- Failing to assure adequate staff training to meet the behavior and social needs of all individuals, including sexual assault victims;
- Failing to implement a system to screen prospective faculty and staff training history;
- Failing to supervise faculty and staff to ensure proper supervision and control;
- Failing to implement safeguards for female students adequate to protect them from foreseeable criminal and anti-social activities; and
- Ratifying the sexual misconduct of professors by failing to discourage such behavior in prior instances.

45. But for the intentional and negligent acts and omissions of Defendants and their violations of the standards of care and statute set forth herein, Plaintiff would not have been injured. Defendants' intentional and negligent acts and omissions therefore amount to negligence, and negligent failure to warn, train and/or educate.

46. As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer, great pain of mind, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; losses due to transferring to a school out of state; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## VII. RELIEF SOUGHT

**WHEREFORE,** Plaintiff prays for damages; punitive damages; costs; interest; statutory/civil penalties according to law; attorneys' fees and costs of litigation, pursuant to 42 U.S.C. § 1988 or other applicable law; and any other such relief as the court deems appropriate and just.

## VIII. DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all questions of fact raised by the Complaint.

Respectfully Submitted:

By: /s Kenneth C. Bordes
**Kenneth C. Bordes (Bar #35668)**
**Attorney at Law, LLC**
2725 Lapeyrouse St.
New Orleans, LA 70119
P: 504-588-2700
F: 504-708-1717
E: kcb@kennethbordes.com

*Attorney for Plaintiff*

10

## **NOTICE AND REQUEST FOR WAIVER**

      Plaintiff's counsel will send waiver forms pursuant to Federal Rule of Civil Procedure 4(d).

                                       By:    /s Kenneth C. Bordes
                                                      **Kenneth C. Bordes (Bar #35668)**

                                                      **Kenneth C. Bordes,**
                                                      **Attorney at Law, LLC**
                                                      2725 Lapeyrouse St.
                                                      New Orleans, LA 70119
                                                      P: 504-588-2700
                                                      F: 504-708-1717
                                                      E: kcb@kennethbordes.com

Dated: May 3, 2016