UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **KALA CHENIER** | * | **CIVIL ACTION NO. 16-4125** |
| | * | **SECTION: G (3)** |
| | * | |
| vs. | * | **JUDGE NANNETTE JOLIVETTE BROWN** |
| | * | |
| **SOUTHEASTERN LOUISIANA** | * | **MAGISTRATE JUDGE DANIEL E.** |
| **UNIVERSITY, ET AL.** | * | **KNOWLES** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

MAY IT PLEASE THE COURT:

This Memorandum is filed by Kala Chenier (hereinafter, "Plaintiff") in opposition to a Motion for Summary Judgment filed by defendant, the Board of Supervisors for the University of Louisiana System (hereinafter "Defendant"). The hearing on this Motion is set for Wednesday, March 15, 2017. In its Motion, Defendant seeks to dismiss Plaintiff's lawsuit on two grounds: (1) that Plaintiff cannot establish a genuine issue of material fact as to all elements of her Title IX cause of action, and (2) that Defendant is by virtue of the Eleventh Amendment immune to any State cause of action brought against it in Federal Court. Defendant's Motion for Summary Judgment should be denied for the reasons more fully set forth below.

I.   FACTS

Plaintiff was a student at Southeastern Louisiana University from August 2014 to May 2015. Rec. Doc. 1 Paragraph 18; Exhibits 1-3. Plaintiff enrolled in Dr. Richard Miller's Ecology course during the spring semester of 2015. Rec. Doc. 1 Paragraph 19; Exhibits 1-3. On

multiple occasions during the semester, Dr. Miller used his position to engage in inappropriate, perverse, harassing, and altogether manipulative behavior. Rec. Doc. 1 Paragraphs 20-28; Exhibits 1-5.

Early on in the semester, Dr. Miller slipped Plaintiff his personal email so that private messages could be sent to him and vice versa. Rec. Doc. 1 Paragraph 20; Exhibits 1-2. Throughout the course of the semester, Dr. Miller used his personal email address to correspond with Plaintiff on oftentimes personal, non-academic matters. Exhibits 1-2.

During one incident in class, Dr. Miller told Plaintiff to smell his shirt and then his crotch for traces of his wife's perfume, to which Plaintiff declined. Rec. Doc. 1 Paragraph 21; Exhibits 1-2, 7. Later in the semester, Plaintiff asked Dr. Miller if they could meet to discuss a paper, and Dr. Miller set a meeting with Plaintiff outside of university grounds at her place of work. Rec. Doc. 1 Paragraph 22; Exhibits 1-2. Dr. Miller then gave Plaintiff his personal cell number to correspond with him. *Id*. Dr. Miller would later use Plaintiff's cell number to repeatedly call and text her throughout the semester. Exhibits 1-2. When they met to discuss the paper, Dr. Miller without being prompted intimated to Plaintiff that his wife was ill, that he had considered leaving his wife, and that he was still young enough to have a life. Rec. Doc. 1 Paragraph 24; Exhibits 1-2. Dr. Miller hinted to Plaintiff his desire for a new relationship or affair. Exhibits 1-2.

While on a class field trip to Tickfaw State Park, Dr. Miller insisted that Plaintiff walk with him to retrieve their lunchboxes from the school van. Rec. Doc. 1 Paragraph 25; Exhibits 1-2. Dr. Miller then unlocked the van, held the door open, and told Plaintiff to jump up and get the lunchboxes. *Id*. Since doing so required her to squeeze past him, jump up the van, and bend

over while he held the door behind her, Plaintiff declined. At this refusal, Dr. Miller was visibly disappointed. *Id*.

On a separate occasion, Dr. Miller told Plaintiff to come to his home and deliver coffee grounds that he had requested her to save for him. Exhibits 1-2. Finding the request to come to his home inappropriate and suggestive, Plaintiff declined and lied to him that the boxes were too heavy for her to deliver. *Id*.

On numerous occasions in class, Dr. Miller would brush against her on purpose. Rec. Doc. 1 Paragraph 27; Exhibit 1. Particularly, he would sweep his hand across her backside or allow his arm to touch Plaintiff's breast while he leaned across her. *Id*. There were also occasions where he would be so close to her that she could feel his beard or breath on her neck. *Id*.

Additionally, Dr. Miller made multiple uninvited and unwelcomed visits to Plaintiff's workplace. Rec. Doc. 1 Paragraph 26. On one of these occasions, he came late at night while Plaintiff was working alone and talked for 25 minutes. During that visit, he brought his wife's perfume for Plaintiff to sample. *Id.*; Exhibits 1-2.

One particularly alarming event occurred at the end of the semester, when Dr. Miller held an evening review session for the final. Rec. Doc. 1 Paragraph 28; Exhibits 1-3. During the review, Dr. Miller would maintain prolonged eye contact with Plaintiff for minutes at a time, which made Plaintiff deeply uncomfortable. *Id*. Following the review, Dr. Miller singled Plaintiff out to help him water plants in the university greenhouse. *Id*. While they were standing in the dark alone inside the greenhouse, waiting for the lights to properly turn on, Plaintiff observed Dr. Miller moving the crotch of his pants, touching himself inappropriately. *Id*.

Plaintiff did not attend class after this event. Exhibit 3. During this time Dr. Miller called Plaintiff's cell phone multiple times. *Id*. At this point, her final exam was imminent, so Plaintiff resolved to speak with Dr. Christopher Beachy, the head of the Department of Biological Sciences, immediately after the final. Once the course ended, Plaintiff and her sister, Kasi Chenier, visited Dr. Beachy's office where they spoke with his secretary. Exhibits 3-4. Plaintiff told Dr. Beachy's secretary that she had a complaint about the inappropriate behavior of one of the professors of the university. *Id*. Dr. Beachy's secretary appeared to already know who it was regarding and responded, "Is this about Dr. Miller?" *Id*. Dr. Beachy's secretary then advised Plaintiff to return next week. *Id*.

The following week, Plaintiff spoke with Dr. Beachy and Dr. Penny Shockett about the sexual harassment she endured, and provided a letter detailing the incidents. Exhibit 3. Plaintiff read the letter and elaborated further on each of the incidents. Exhibit 1. During this meeting Dr. Beachy told Plaintiff that it was not the first time someone had made such a complaint about Dr. Miller. Exhibit 3. The letter provided was later revised to incorporate the elaborations Plaintiff made during her meeting with Dr. Beachy and Dr. Shockett, and is herein incorporated as Exhibit 1.

Much later, Plaintiff received a call from Gene Pregeant, the Compliance Officer for Southeastern Louisiana University, informing her that Dr. Miller had tenure and that it was difficult to remove a tenured professor. *Id*. Mr. Pregeant also told Plaintiff that Dr. Miller remained employed despite the numerous complaints against him. *Id*. Plaintiff and her aunt, Debra Turchi, subsequently met with Mr. Pregeant and another representative of the school. Exhibits 3-5. During this meeting, Plaintiff was told that this was not the first time a complaint

had been lodged about Dr. Miller's sexual misconduct. *Id.* Despite complaints about Dr. Miller, Dr. Miller remained employed by the university into the next academic year. Exhibit 3. Plaintiff received no word for months regarding her most recent complaints. *Id*. Plaintiff was then informed later that Dr. Miller elected to resign. *Id*.; Rec. Doc. 22-4 No. 23; Rec. Doc. 22-2 Paragraph 9.

Plaintiff maintained an "A" average in Dr. Miller's class until her classmates expressed openly that Dr. Miller treated Plaintiff more favorably than anyone else. After Dr. Miller heard this, Plaintiff's grades on assignments and exams dropped sharply, and she ultimately finished with a B final grade. Rec. Doc. 1 Paragraph 30; Exhibits 1-2.

II. ARGUMENT

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The bar against discrimination on the basis of sex under Title IX is enforceable through an implied private right of action, which allows monetary damages to be recovered against the Federal financial assistance recipient. *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560; *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208. To have a valid Title IX cause of action, each of the following elements must be established: (1) the recipient of Federal financial assistance had actual knowledge of the harassment; (2) the harasser was under the recipient's control; (3) the harassment was based on the victim's sex; (4) the harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to

an educational opportunity or benefit"; and (5) the recipient was deliberately indifferent to the harassment. *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011).

It is undisputed that Defendant is a Federal financial assistance recipient subject to the requirements of Title IX, and that Plaintiff's harasser, Dr. Richard Miller, is under the control of Defendant. Defendant argues in its motion that the remaining elements cannot be supported by the uncontested facts of the case. It should be especially noted that at this time, Defendant's discovery responses are delinquent, and Plaintiff has not received any of the requested information and documents.[1]

### A. DEFENDANT HAD ACTUAL, TIMELY NOTICE

In order to satisfy the element of notice under this cause of action, an employee or official of Defendant who has, at minimum, the authority to institute corrective measures on Defendant's behalf must have actual notice of the harasser's misconduct. *Gebser v. Lago Vista Indep. Sch. Dis.*, 524 U.S. 274, 118 S.Ct. 1989 (1998). Monetary damages under Title IX against a Federal financial assistance recipient, for a teacher's sexual harassment of a student, is only allowed if the recipient has actual knowledge of sexual harassment or sexual discrimination; such recovery is not permitted under the principles of *respondeat superior* or constructive notice. *Id.* However, while the recipient must have actual notice of the events culminating sexual harassment or sexual discrimination, there is no requirement that such notice must be given by the victim herself. See OCR "Dear Colleague Letter" at p. 4, attached as Exhibit 6. In a letter from the Office of Civil Rights and the U.S. Department of Education, which explains the

---

[1] Plaintiff has held conference under FRCP 37.1 and Defendants have indicated that discovery would be provided by about March 14, 2017. These responsive documents are essential and Plaintiff notes this to make the Court aware that this Motion is being opposed without the benefit of said discovery responses.

requirements of Title IX and provides significant guidance to Federal financial assistance recipients, it states in relevant part:

> Regardless of **whether a harassed student, his or her parent, or a third party files a complaint** under the school's grievance procedures or otherwise requests action on the student's behalf, **a school that knows, or reasonably should know, about possible harassment must promptly investigate** to determine what occurred and then take appropriate steps to resolve the situation.

*Id*.

That is, when the university receives notice from *anyone*, the university is required to respond immediately by opening an investigation and taking the appropriate steps to address the matter. Notice given by anyone, not just the victim, shall be adequate and in satisfaction of this element.

In Defendant's motion, Defendant doesn't deny that actual notice was given to a school official who has authority to take corrective measures on its behalf; in which case, Plaintiff did provide such notice when she submitted a detailed letter and met with the head of Department of Biological Sciences and thereafter the university's compliance officer. Rec. Doc. 22-2 Paragraph 2; Exhibit 3. Instead, Defendant argues that the notice provided by Plaintiff was too untimely to hold Defendant accountable under Title IX. Rec. Doc. 22-2 Paragraph 2. Defendant asserts that the first actual notice it received of Dr. Richard Miller's misconduct was after Plaintiff's Ecology course ended and after Plaintiff received her final grade. Rec. Doc. 22-4 Nos. 2, 6, 8, and 9; Rec. Doc. 22-2 paragraphs 2 and 7. As its only evidence, Defendant cites and attaches the Plaintiff's letter she provided to school officials detailing the numerous occasions that Dr. Miller sexually harassed her and discriminated against her based on her sex. Rec. Doc. 22-3. Defendant argues that because the letter was received after Plaintiff's coursework with Dr. Miller was completed and after she left the university that (1) Defendant

was not given the opportunity to take corrective action while she was enrolled, (2) Plaintiff could not have been denied an educational opportunity, and (3) Defendant could not have been deliberately indifferent to the harassment.  Rec. Doc. 22-4 Nos. 4, 5, 7, 12, and 24; Rec. Doc. 22-2 paragraphs 2, 6, 7, and 8.

However, Plaintiff's letter presented to Defendant, which in and of itself should qualify as satisfactory notice, was not the first time Defendant was made aware of Dr. Miller's sexual misconduct.  Exhibits 3-5.  Immediately after grades were posted for Dr. Miller's class, Plaintiff and her sister, Kasi Chenier, visited Dr. Christopher Beachy's office to discuss Dr. Miller's actions toward Plaintiff.  Exhibits 3-4.  Dr. Beachy is the head of the Department of Biological Sciences at Southeastern Louisiana University.  Plaintiff told Dr. Beachy's secretary that she wanted to speak to Dr. Beachy about the sexual harassment she experienced from one of her professors.  Exhibits 3-4.  In response, Dr. Beachy's secretary asked, "Is this about Dr. Miller?"  *Id*.  Dr. Beachy's secretary immediately and correctly assumed that Dr. Miller was the professor who sexually harassed Plaintiff, indicating that the university was already well-aware of Dr. Miller's sexual misconduct towards students, that there was a history of such conduct, and that complaints have been made to the university regarding him.  Dr. Beachy's secretary asked Plaintiff to return the following week to talk to Dr. Beachy.  Exhibits 3-4.  It was also around this time that the Defendants requested that Plaintiff write a letter detailing these most recent violations, a letter which they have now attached only one version of in their motion, and that Defendants are attempting to use in dismantling Plaintiff's actionable civil rights claims.

The next week, Plaintiff met with Dr. Beachy and Dr. Penny Shockett and provided a detailed letter outlining Dr. Miller's history of sexual harassment.  Exhibits 2-3.  Plaintiff gave

them additional verbal information on each incident during the meeting, one in particular being the greenhouse incident during which Dr. Miller masturbated in her presence. Exhibits 1 and 3; Rec. Doc. 1 Paragraph 28.  In this meeting, Dr. Beachy told Plaintiff that this was not the first time he had been made aware of Dr. Miller's conduct.  Exhibit 3.  Allegedly Defendants' representatives took notes in this meeting; however, nothing has been turned over thus far.

Thereafter, Plaintiff and her aunt, Debra Turchi, met with two representatives of Defendant, one of them being Gene Prejeant, Compliance Officer for Southeastern Louisiana University.  Exhibits 3 and 5.  The representatives in this meeting informed Plaintiff, as Dr. Beachy did, that this was not the first occasion that a complaint was made regarding Dr. Miller's sexual harassment or discrimination.  *Id*.  Defendant's representatives referred to a file held on Dr. Miller allegedly detailing such complaints.  *Id*.  Again, Defendants' representatives took notes in this meeting; however, nothing has been turned over thus far nor has any employment or other file detailing Dr. Richard Miller's employment.

Plaintiffs have also been made aware of complaints from other students, one of which wrote a detailed seventeen page letter to the Defendants regarding Dr. Miller's conduct that semester.  Exhibit 7.  The Defendants do not deny receiving this additional, detailed complaint, which makes reference to an audio file containing graphic and offensive conduct from Dr. Miller during one of the class periods.  *Id.* at p. 1.  No audio file has been turned over by the Defendants.

In receiving these complaints, obviously numerous in nature, Defendant was required to take corrective action immediately rather than sit idly by while students of its university repeatedly suffered sexual harassment and discrimination by Dr. Miller.  Apart from receiving

actual written and verbal notice from Plaintiff, Defendant had actual knowledge that Dr. Miller sexually harassed students and continued to keep Dr. Miller under its employ nonetheless. As the letter from the Office of Civil Rights requires, if a school receives a complaint from anyone, whether it be the victim, a parent of the victim, or a third party, the school must respond immediately and take steps to resolve the matter. Exhibit 6. Complaints were already lodged with Defendant about Dr. Miller's sexual harassment before Plaintiff spoke to Dr. Beachy and Dr. Shockett, which constitutes timely and actual notice that should have compelled Defendant to act immediately in taking corrective action. Exhibits 3 and 5.

### B. DR. MILLER'S HARASSMENT OR DISCRIMINATION OF PLAINTIFF WAS BASED ON HER SEX

During the course of the semester, Dr. Miller made multiple sexual advances toward Plaintiff within the classroom, the laboratory, the university greenhouse, and other locations outside of the university. Exhibits 1-3; Rec. Doc. 1 Paragraphs 20-28. Early on in the semester, Dr. Miller slipped Plaintiff his personal email so that she could send private messages to him and vice versa. Exhibits 1-2; Rec. Doc. 1 Paragraph 20. There was also an incident in class where Dr. Miller suggestively told Plaintiff to smell his shirt and to then smell his crotch for traces of his wife's perfume. Exhibits 1-3; Rec. Doc. 1 Paragraph 21. On another occasion, Dr. Miller suggested meeting outside university grounds when Plaintiff asked if they could meet to discuss a paper. Exhibits 1-2; Rec. Doc. 1 Paragraph 22. At this point he gave his personal cell number to Plaintiff. Exhibits 1-2; Rec. Doc. 1 Paragraph 22. When they met to discuss the paper, the conversation evolved from being professional to intimate, with Dr. Miller divulging information to Plaintiff of the difficulties of his marriage and his wife's illness. Exhibits 1-2; Rec. Doc 1

Paragraph 24.  Dr. Miller stated, "Most other men would have left a long time ago.  I am proud of myself for sticking around."  Exhibits 1-2.  He told Plaintiff that he was still young enough to have a life, insinuating his desire for a new relationship or affair.  *Id*.

Plaintiff also recalls a moment she experienced on a class field trip to Tickfaw State Park.  *Id*.; Rec. Doc. 1 Paragraph 25.  Dr. Miller separated Plaintiff and her partner and insisted that Plaintiff accompany him alone to get their lunchboxes from the Biology van.  *Id*.  Dr. Miller unlocked the van door, held it open, and told Plaintiff to climb up and get the lunchboxes.  *Id*. To do so required Plaintiff to squeeze past Dr. Miller, climb up into the van, and bend over to grab the boxes while he continued to hold the door behind her.  *Id*.  Plaintiff declined doing this to avoid being in a compromising position.  *Id*.  Dr. Miller was visibly disappointed.  *Id*.

On another occasion, Dr. Miller told Plaintiff to come to his home and deliver coffee grounds he requested her to save for him.  Exhibits 1-2.  The suggestive, obviously inappropriate, and unprofessional request to come to his home made Plaintiff deeply uncomfortable and compelled her to lie to him about being unable to deliver them.  *Id*.  Plaintiff declined and told Dr. Miller that the boxes of coffee grounds were too heavy for her to carry.  *Id*.

On one Sunday, Dr. Miller, Plaintiff, and another student worked inside the greenhouse on a research project.  *Id*.  Dr. Miller directed the other student to run an errand, thereby leaving the two of them alone.  *Id*.  At this point, Dr. Miller instructed Plaintiff to mix fertilizer on the ground while he stood and watched.  *Id*.  Plaintiff was on her hands and knees while Dr. Miller stood directly behind her watching as she worked.  *Id*.

Another incident occurred after a final exam study session.  *Id*.; Rec. Doc. 1 Paragraph 28.  Dr. Miller asked Plaintiff to help him water plants in the greenhouse.  *Id*.  Plaintiff, at this

point in the semester, was nervous and scared that Dr. Miller would take his sexual advances a step further. *Id*. In the greenhouse, both Plaintiff and Dr. Miller stood in semi-darkness for a few minutes until the greenhouse lights properly turned on. See Exhibit 6. Through the darkness, Plaintiff was able to observe Dr. Miller moving the crotch of pants with hand, touching himself inappropriately. Exhibits 1 and 3; Rec. Doc. 1 Paragraph 28.

Throughout the semester, Dr. Miller sent Plaintiff numerous inappropriate, unprofessional personal emails to her private and school email accounts. Exhibits 1-3. Dr. Miller texted and called Plaintiff's cell phone numerous times, oftentimes on personal matters that had nothing to do with his Ecology class. *Id*. His tone of voice was oftentimes soft and gentle toward Plaintiff, which contrasted with his tone with any other student or person. Exhibits 1-3. Dr. Miller also came to Plaintiff's place of employment uninvited multiple times; on one of those occasions he lingered about 25 minutes and even brought some of his wife's perfume for Plaintiff to sample. Exhibits 1-2; Rec. Doc. 1 Paragraph 26. During classes, Dr. Miller regularly brushed against Plaintiff, with his hand sweeping her backside or with his arm touching her breast as he leaned across her. Exhibits 1 and 3; Rec. Doc. 1 Paragraph 27. He would be so close to her that at times that Plaintiff could feel his breath or beard on her neck. *Id*. Dr. Miller's candor and sexual advances toward Plaintiff alarmed her, her family, and her classmates. See Exhibits 1-5.

His actions toward Plaintiff clearly show more than just run-of-the-mill nepotism or favoritism of a student; rather his personal calls, personal texts, personal emails, uninvited visits to her workplace, physical touching, masturbation, and other interactions described can only be explained by a romantic or sexual motive on the part of Dr. Miller. These suggestive and

inappropriate gestures towards Plaintiff detailed above can amount to nothing other than hostile environment sexual harassment on the basis of Plaintiff's sex.

### C. THE SEXUAL HARASSMENT DENIED PLAINTIFF AN EDUCATIONAL OPPORTUNITY OR BENEFIT

Caselaw requires that the harassment or discrimination experienced by the victim must be "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit." *Sanches*, 647 F.3d at 165. Whether such harassment is actionable "depends on a constellation of surrounding circumstances, expectations, and relationships," such as "the ages of the harasser and the victim and the number of individuals involved." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 653 (1999); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998); OCR Title IX Guidelines 12041-12042. Sexual harassment has been understood to include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. *Davis*, 536 U.S. at 653. In the 2001 Revised Sexual Harassment Guidance published by the Office of Civil Rights, it states, " … in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment. For example, a teacher's repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment." OCR 2001 Revised Sexual Harassment Guidance, 66 FR 5512.

Defendant argues that because Plaintiff did not give notice of the sexual harassment until after grades were submitted and the class was completed, she could not have been denied an educational opportunity or benefit. Rec. Doc. 22-2 Paragraph 7. Defendant argues that Plaintiff

received a "B" grade, which is an above average grade, and that essentially Plaintiff should not be upset about it. *Id.*.

Defendant's argument runs counter to the purpose of Title IX. To be denied an educational opportunity or benefit is not just being able to complete a class and receive a grade. Dr. Miller's inappropriate behavior toward Plaintiff during multiple events and occasion throughout the entire semester shocked Plaintiff, her family, and her classmates. Exhibits 1-5. Such sexual misconduct was so severe, pervasive, and objectively offensive that it denied Plaintiff an equal educational opportunity to learn in an environment free of constant and continuing sexual harassment. The sexual harassment was so pervasive and so detrimental to Plaintiff's mental health that it compelled Plaintiff to leave the university, finish her education at another institution out-of-state (at a much higher expense), and to seek therapy. Exhibits 3 and 5. If the standard to assess the harassment is objective offensiveness, then it matters little that she chose to endure the harassment during the course of the class through naivety and subjective choice. She should not have to endure it at all. Plaintiff should not be penalized for choosing to finish her coursework with Dr. Miller before she reported the incidents of sexual harassment, especially since Defendant already knew of Dr. Miller's sexual misconduct. Furthermore, to imply that Plaintiff "finished" her coursework simply because she received a grade is disingenuous. She was unable to attend several classes, and after the incident in the greenhouse, stopped going altogether. Exhibit 3. That is hardly receiving an education. In fact, knowing that Dr. Miller would be present at the final, Plaintiff attended to take it only in the presence of friends and made sure to leave in their presence as well. Exhibit 3. Plaintiff moved out of her home and to a family member's house in another Parish following this semester because Dr.

Miller knew where she lived and worked. Exhibits 3 and 5. The fact remains, and Defendants do not deny, that Dr. Miller was never removed by the University for these or any other actions and was still employed at the University well into the next academic year. Exhibit 3.

Additionally, Dr. Miller's sexual misconduct denied Plaintiff the educational benefit of fair and unbiased grading. Plaintiff maintained a high A throughout Dr. Miller's Ecology class. Exhibits 1-2; Rec. Doc. 1 Paragraph 30. As more students noticed and expressed the clear nepotism Dr. Miller had for Plaintiff, Dr. Miller ultimately gave Plaintiff a "B" as her final grade to save himself the accusation of being subjective and preferential toward Plaintiff. *Id*. Receiving a "B" for her final grade is incommensurate with her overall "A" performance in his class, taking into account all exams, assignments, and papers.

### D. DEFENDANT WAS DELIBERATELY INDIFFERENT TO THE HARASSMENT

A Federal financial assistance recipient may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm even if the response taken does not actually cure the problem. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). In this instance, Defendant argues that because it is an undisputed fact that it did not receive timely notice from Plaintiff, Defendant could not possibly have been deliberately indifferent to Plaintiff's harassment as a matter of law. As shown though in Section A of this Opposition, Defendant had actual knowledge and notice of the allegations of sexual harassment against Dr. Miller before the close of the semester.

Additionally, Defendant argues that the response it did take after hearing Plaintiff's allegations was reasonable and appropriate, and that ultimately, Dr. Miller resigned before the

tenure revocation proceedings began. However, Defendants had ample opportunity to investigate and proceed with actions against Dr. Miller for several months. Exhibit 3. In fact, Dr. Miller maintained his employment well into the next academic year. *Id*. Plaintiff was provided little information as to the status of the investigation or whether the Defendant was taking any meaningful action whatsoever. *Id*. In fact, the basic information conveyed to Plaintiff then, just like in Defendant's motion and statement of facts here (Rec. Doc. Nos. 22-2 and 22-4), was that Dr. Miller was a "tenured" professor with constitutionally protected rights - rights that appear to carry significantly more weight based on Defendant's deliberately unresponsive actions than Plaintiff's Title IX rights violated by that same tenured professor.

Furthermore, Defendant ignored several other complaints regarding Dr. Miller, many of which Defendant clearly seem to know about, yet have provided little to no information on. (See Exhibit 7 - a 17 page letter from an anonymous student to Defendant). Plaintiff will be in a better position to explore additional instances of deliberate indifference of Defendant once Plaintiff is provided with Defendant's delinquent discovery. However, Defendant has filed this Motion and argument without providing such responsive information.

    E. THIS COURT MAY EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS

The Eleventh Amendment of the United States Constitution reads, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This Amendment has been interpreted to bar lawsuits filed by the citizens of a State against the State or its instrumentalities in Federal Court. *Poindexter v.*

*Greenhow*, 114 U.S. 270, 287, 5 S.Ct. 903, 912, 29 L.Ed. 185 (1885). Defendant asserts that as an arm of the State, it has Eleventh Amendment immunity against Plaintiff's State law claims including negligence. Rec. Doc. 22-4 No. 25; Rec. Doc. 22-2 Paragraph 10. Defendant states that this immunity has not been waived and has been expressly preserved by La. R.S. 13:5106(A), which provides, "No suit against the state or a state agency or political subdivision shall be instituted in any court other than a Louisiana state court." Rec. Doc. 22-2 Paragraph 10.

However, this Court has original jurisdiction over Plaintiff's 20 U.S.C. § 1681 (Title IX) cause of action, which presents a federal question. 28 U.S.C. § 1331. And as a recipient of Federal financial assistance, Defendant was required to unambiguously and unequivocally waive its Eleventh Amendment immunity to Title IX causes of action in Federal Court. 42 U.S.C. § 200d-7(a)(1). Since this Court has original jurisdiction over Plaintiff's Federal claim, it also has supplemental jurisdiction to any State law claim including negligence that "arises out of the same case or controversy." 28 U.S.C. 1367(a). Section (a) of 28 U.S.C. 1367 states:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are **so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.** Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

This section allows Federal Courts to exercise supplemental jurisdiction over a State claim if the State and Federal claims "derive from a common nucleus of operative fact," *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In fact, in other circuits the courts have acknowledged their ability to hear State law claims specifically in conjunction to a Title IX claim if they form a part of the same case on controversy. *Varnell v.*

*Dora Consol. Sch. Dist.*, 756 F.3d 1208 (10th Cir., 2014); *Doe-2 v. McLean County Unit Dist. 5 Bd., Directors*, 593 F.3d 507 (7th Cir., 2010).

In this case, Plaintiff's State law claim of negligence is so related to Plaintiff's Title IX claim that they form part of the same case or controversy.  In Plaintiff's Original Complaint, Plaintiff argues that Defendant owed a duty to take reasonable measures to protect her and to properly warn, train, and educate her and other students about how to avoid sexual abuse or sexual harassment.  Rec. Doc. 1 Paragraph 41.  Plaintiff alleges in her negligence claim that Defendant knew or should have known of Dr. Miller's sexual misconduct, as multiple complaints were made in the past regarding Dr. Miller's behavior toward students, and that Defendant breached its duty of care toward Plaintiff.  Rec. Doc. 1 Paragraph 42.  Plaintiff's negligence claim shares a common nucleus of operative with her Title IX claim, and therefore, supplemental jurisdiction exercised by this court is appropriate.

III.   CONCLUSION

Defendants are asking this Court to excuse their mistakes by alleging that: 1) they had no notice specifically from the Plaintiff, 2) even if notified, Defendants argue that Dr. Miller's actions in harassing, mentally abusing, stalking, and masturbating in front of the Plaintiff is not so bad and pervasive, 3) even if notified and the actions were violations, that they took reasonable corrective action, despite the fact that Dr. Miller remained into the next academic year and was never the subject of a hearing, and 4) none of these egregious violations deprived Plaintiff from her right to an education free of such discrimination.  However, they provide no answer for actual notices received from other students.  No answer for the pattern of pervasive and troubling conduct allowed through Dr. Miller's continued employment.  No answer for their

inexplicable failure to address known violations of Dr. Miller prior to Plaintiff's injuries; likewise, no answer for their continued failures into the next academic year having never had a hearing with Dr. Miller.  Ms. Chenier was deprived her education by Defendants.  She was forced to miss classes, or take them under the constant gaze of her sexual harasser.  She was forced to leave her in-state University and proceed with her education out-of-state, at a significant cost, and with the added expense and trauma of what she suffered due to Defendants deliberate indifference.

For the reasons and evidence set forth, Plaintiff respectfully requests that this Court deny Defendants Motion, require delinquent discovery be tendered, and hold Defendants answerable to the pertinent facts herein.

Respectfully Submitted,

_____/s/Kenneth C. Bordes_____
**Kenneth C. Bordes,**
**Attorney at Law, LLC**
2725 Lapeyrouse St.
New Orleans, LA 70119
P:504-588-2700
F: 504-708-1717
E: kcb@kennethbordes.com

*Attorney for Plaintiff*

I hereby certify that the above and foregoing has been electronically filed with the Clerk of Court and served on opposing counsel via the CM/ECF system in accordance with LR 5.4 and Fed. R. Civ. P. 5(b)(3) on this 7th day of March, 2017.

   /s/ Kenneth C. Bordes
Kenneth C. Bordes